UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SCOTT A. KANTER and DELUGE, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>SCOTT J. WERNER, WERNER ENTERPRISES and L&C SPRING WATERS OF NEW ENGLAND, LLC (f/k/a L&C SPRING WATERS OF NEW ENGLAND HOLDING COMPANY, LLC.),<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>) CIVIL ACTION NO. 04-10489(RCL)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS OR IN THE ALTERNATIVE TO STAY THESE
PROCEEDINGS PENDING MEDIATION OR ARBITRATION**

The Plaintiffs, Scott Kanter ("Kanter") and Deluge, LLC ("Deluge") (collectively "Plaintiffs"), hereby oppose the defendants' motion to compel arbitration of this dispute. While it is true that federal policy favors the enforcement of agreements to arbitrate, it is equally true that arbitration remains a matter of contract and a party cannot be required to arbitrate a dispute in the absence of an agreement to do so. Here, the Defendants concede that none of them are "Members" under the Deluge Operating Agreement and did not sign or otherwise become bound in any way by the Operating Agreement. The mediation and arbitration clauses in the Operating Agreement could not be clearer that they only apply to disputes that arise "between the Members" as to various matters. By their terms, therefore, the mediation and arbitration clauses in the Operating Agreement cannot apply to the present dispute, which does not arise between Members of Deluge, but between third parties. Moreover, the claims alleged do not arise out of the Operating Agreement, but arise independently under state statutes and common law.

Moreover, in applying state law contract principles to determine the existence and scope of an agreement to arbitrate, courts should look to the terms of the contract itself to discern the parties' intent. Here, the arbitration clause, which was executed solely by Scott Kanter and Portogon Investments, S.A., speaks only in terms of "Members" of Deluge, as defined under that agreement. The arbitrators are to be chosen by the "Members," judicial relief may be sought only by a "Member," and the decision of the arbitrator is binding only on the "Members." Where a contract so clearly limits the parties to which it is subject, and procedurally would be entirely unworkable in the event a third party were held to have standing to invoke it, any attempt by that non-signatory third party to compel arbitration under this narrowly drawn provision should be denied.

## BACKGROUND FACTS

On April 15, 1997, Kanter entered into an Operating Agreement with Portogon Investments, S.A. ("Portogon"), a Panamanian corporation with offices in Jersey, Channel Islands, to form Deluge, a Massachusetts limited liability company. *See Exhibit A, Affidavit of Scott Kanter, dated July 27, 2004* ("*Kanter Aff.*"), ¶ 2. The Operating Agreement provides that Deluge has two, and only two, "Members," Kanter and Portogon. *Kanter Aff.*, Ex. A. The Operating Agreement also provides that Kanter is the sole manager and that the registered offices of Deluge are located at 109 State Street, Boston, MA 02109. *Kanter Aff.* ¶ 2.

On June 10, 1997, a ground lease to 44.19 acres in Brentwood, New Hampshire, and rights to the Brentwood Spring, a natural spring water source, were transferred to Deluge. Between June 10, 1997 and the present, the primary business of Deluge has been, and continues to be the supply of natural spring water from the Brentwood Spring, to which Deluge has exclusive rights under the ground lease. The current ground lease runs through September 30,

2006, and is subject to four successive 10-year extensions.  The Brentwood Spring is currently a profitable water source, supplying water to numerous third party vendors under long-term contracts, including, among others, Royal Ahold and Ahold USA, which owns Stop & Shop locally, among other businesses.  *Kanter Aff.* ¶ 4.

Although he is not a Member of Deluge under the Operating Agreement, Werner has been managing the day-to-day operations of Deluge, conditioned upon and with the obligation to report regularly to Kanter regarding the operations of the business.  At no time has Werner ever been a Member of Deluge under the Operating Agreement, nor is he or any of his companies presently a Member.  Rather, Werner has been acting akin to an employee at will, subject to removal at any time.  Werner and Kanter have never executed any contract of any kind that contains any arbitration clause or other agreement to submit disputes between them to arbitration.  Nor has Werner or the other defendants executed any such agreement with Deluge. *Kanter Aff.* ¶ 5.

Beginning in early 2001, Werner began to delay providing financial information to Kanter related to Deluge and the Brentwood Spring.  Requests by Kanter for balance sheets, income statements and detailed general ledgers for Deluge in May and June 2001 went unanswered, and Werner claimed that he had his own accountant prepare the information.  During this period, Werner also transferred the tax accounting for Deluge to a firm in New Hampshire.  Throughout this period, Kanter continued to demand detailed financial information regarding the business, and Werner refused to provide this information.  *Kanter Aff.* ¶ 6.

Moreover, unknown to Kanter at the time, Werner undertook efforts to take control of the profits emanating from the Brentwood Spring by seeking to unlawfully move the ownership and management of Deluge to himself and his own operating company, L&C Spring Waters of New

3

England, LLC ("L&C"). Kanter never signed any authorization for any transfer of a Membership interest to Werner, as required under the Deluge Operating Agreement. Thus, Werner never owned any Membership interest in Deluge and, by his own admission, still does not have any such interest. Nonetheless, Werner subsequently secretly transferred all of the management and operations of Deluge to his own company, L&C including all of the day-to-day operations, documents, revenues and profits of the Brentwood Spring. *Kanter Aff.* ¶ 7.

Between February 2002 through the filing of this lawsuit in March 2004, Kanter was provided virtually no information regarding the day-to-day operations of Deluge, L&C or the Brentwood Spring, other than summary financial information included within Deluge's publicly-filed annual tax returns and a summary annual financial statement. Despite repeated requests for legal documents, detailed financial statements and ledgers, and source documents such as bank statements, cancelled checks and credit card statements, Kanter was provided none of this information. Likewise, Werner refused to provide any documentation or support for various "expenses" charged by Werner or L&C to Deluge, including undocumented inter-company "transfers," unsupported "management fees," unauthorized "loans" and similar unidentified payments made by Deluge to Werner, Werner Enterprises and/or L&C. *Kanter Aff.* ¶ 8.

During late 2002 and into 2003, Kanter became increasingly concerned about his inability to obtain detailed financial information regarding the operations of Deluge and the Brentwood Spring from Werner. Promises to provide the requested information continued to go unmet, and Werner provided the bare minimum information to allow Kanter to prepare his own personal tax returns, and nothing more. In addition, charges in the form of undocumented and unauthorized loans, transfers, management fees and miscellaneous expenses continued to be assessed by Werner, Werner Enterprises and/or L&C during this period. During 2003, Werner

4

provided even less information than he had during 2002, and the communications between Werner and Kanter grew less and less frequent, despite repeated attempts by Kanter to schedule a meeting and review the detailed information of Deluge, L&C and the Brentwood Spring. Kanter also sought to obtain information directly from Werner's New Hampshire accountant, but was again provided only summary information without supporting detail. *Kanter Aff.* ¶ 9.

Between December 31, 2003 and March 10, 2004, Kanter demanded that Werner provide him at Deluge's registered offices at 109 State Street, Boston, Massachusetts 02109, all documents related to the activities of L&C and Deluge, including, but not limited to, records of all bank accounts in either Deluge's or L&C's name, all account statements, credit card statements and receipts, signed contracts, purchase orders, paid and unpaid invoices, notes, drafts, checks, cancelled checks, payroll tax returns, Form 1099s, and any other documents or information in connection with the operations of Deluge. During this period, Kanter was provided no information. Moreover, at no time did Werner claim to be a Member of Deluge or demand arbitration or mediation of this dispute under the Operating Agreement. *Kanter Aff.* ¶ 10. It was only much later, after this litigation had been filed in this Court and a motion for Preliminary Injunction was pending, did Werner apparently stumble upon the argument that he, as an admitted non-Member of Deluge, might argue that the matter should be arbitrated.

Concerned that the assets of his company were being stolen out from under him, Kanter filed an action on March 10, 2004, seeking a declaratory judgment, permanent injunctive relief, the appointment of a receiver, and damages, alleging that the Defendants unlawfully had converted, and were continuing unlawfully to convert the assets and revenues of Deluge and the Brentwood Spring to their own personal use, in the form of unauthorized loans, advances, personal expenses, charges and transfers. Kanter also alleged that the Defendants had refused to

produce any detailed information, including bank statements, cancelled checks, contracts and credit card statements concerning the current and historical management and business of the Brentwood Spring. Each of these claims was brought, not under the terms of the Operating Agreement, but under state law. *Kanter Aff.* ¶ 11.

Simultaneous with the filing of the complaint, Kanter also filed a motion for a preliminary injunction and for expedited discovery, seeking a Court order requiring the production of the requested documents and sufficient controls over the business such that further assets would not be unlawfully converted and potential remedies lost. Just prior to a hearing on the Plaintiffs' motion, the parties agreed to a stipulated preliminary injunctive order providing for the production of certain information, the establishment of a separate or dedicated accounting in the name of Deluge, and certain prohibitions and disclosure requirements on future transactions in connection with the Brentwood Spring.[1] The parties are also prohibited from altering, destroying or tampering in any way with any document related to Deluge, L&C or the Brentwood Spring, including all documents reflecting the operations of, sale of water from, revenues received or payments made in connection with water originating from the spring. On April 9, 2004, this Court entered the stipulated order as an order of the Court. *Kanter Aff.* ¶ 12.

Notwithstanding their agreement to the terms of the preliminary injunction, and the entry of the injunction as an order of the Court, the Defendants have still delayed and refused to

---

[1] The defendants do not dispute that even if the Court were to find that arbitration of the underlying dispute were required, injunctive relief to protect the *status quo* and to protect the assets of the Brentwood Spring, including a receiver, is specifically contemplated by the agreement and is entirely appropriate. See, e.g., Discount Trophy & Co. v. Plastic Dress-up Co., No. Civ. 3:03CV2167, 2004 WL 350477, at *8-*9 (D. Conn. Feb. 19, 2004) (court has both the power and the duty to entertain motion for and impose injunctive relief pending arbitration); *Kanter Aff.*, Ex. 1, Operating Agreement ¶ 17.1 (no provision of dispute resolution clause shall limit right of court to grant ancillary relief, including injunctive relief). Thus, the Defendants' motion to stay this case pending arbitration should have no effect on the pending motions for contempt and for the appointment of a receiver.

BO1 15657410.1

provide all of the information required by the preliminary injunction. In addition, the Defendants have failed to confirm that a separate accounting has been established for Deluge and the Brentwood Spring, and the limited documents that have been produced have demonstrated continuing violations of the Court's order and continuing unlawful conduct. This led the Plaintiffs to file a motion for contempt of the Court's order, which is currently pending. *Kanter Aff.* ¶ 13.

Equally important to the Court and to the Plaintiffs, the documents that have been produced provide a complete vindication and support for the concerns that led to the filing of the present lawsuit. Although still woefully incomplete, even the limited documents produced demonstrate that the Defendants have converted hundreds of thousands of dollars of Deluge's assets, derived from the Brentwood Spring, in the form of personal travel, loans, advances and similar transfers. For example, Werner appears to have charged travel to Hawaii, Europe, the Middle East and throughout the United States to Deluge and the assets of the Brentwood Spring. This travel in the last several years has amounted to thousands of dollars *per month*. Similarly, the documents show tens of thousands of dollars in annual "management fees" in addition to Werner's "salary." None of these charges were approved by Deluge and all of these "expenses" are subject to recoupment by Deluge. *Kanter Aff.* ¶ 15. In the present motion to compel arbitration, Werner does not dispute any of these facts, stating instead only that they should be assessed by an arbitrator, rather than by this Court.[2]

---

[2] Tellingly, despite obtaining an affidavit from Portogon stating that it would prefer that these matters are settled rather than litigated, that affidavit does not assert that Werner and his companies have not engaged in the unlawful conduct alleged by the Plaintiffs. In fact, in recent discussions with Portogon's representatives, they have concurred that the evidence gathered to date appears to show that Werner has engaged in highly suspicious and troubling conduct, and Portogon agrees that Werner must repay the amounts that have been unlawfully taken from Deluge. *Kanter Aff.* ¶ 17.

7

The limited information produced concerning the contracts that govern the Brentwood Spring paints a similarly troubling picture. These contracts demonstrate that the Brentwood Spring is the exclusive source for tens of millions of gallons of water, with associated revenues in the hundreds of thousands of dollars, but these revenues and profits do not appear to be flowing through the Deluge bank account, the exclusive lessee of the Spring. *Kanter Aff.* ¶ 18. For example, the agreement with Suiza provides that up to 50,000,000 gallons annually shall come from the Brentwood Spring for a term of seven years. Based on the price for the water in the contract, this single relationship translates to up to a maximum of $750,000 of revenue to the Brentwood Spring. Nonetheless, in their efforts to divert this revenue, this contract for the production and delivery of water from the Brentwood Spring was executed by the Defendants in the name of entities other than Deluge. Moreover, consistent with this conversion, virtually all of the monies in the Deluge bank account were drained in 2002, and deposits, including those from the contract (a monthly $25,000 payment), were directed to a non-Deluge account. These contracts were never shown to Kanter or Portogon. *Kanter Aff.* ¶ 20.

Finally, the limited information produced also raises an additional significant concern. Specifically, the documents reflect that water from the Brentwood Spring is being pumped from the Spring for the benefit of companies other than Deluge, despite Deluge's exclusive lease over the Spring. *Kanter Aff.* ¶ 21. This is nothing more than common conversion by a third party, and has nothing to do with the internal operations of Deluge or any rights or obligations created under the Operating Agreement between Kanter and Portogon.

In light of the continuing concerns over the Defendants' violations of the Court's injunction order and the apparent conversion of the assets of the Brentwood Spring to the benefit of unrelated third parties, on July 9, 2004 the Plaintiffs moved for the appointment of a receiver

to oversee the operations of Deluge and the Brentwood Spring. *Kanter Aff.* ¶ 22. In response, and almost five months after this action was originally brought, the Defendants, who are admittedly not parties to the Operating Agreement and not Members of Deluge, have moved to compel arbitration. In doing so, however, the Defendants do not dispute that they have engaged in the unlawful conduct alleged in the complaint, nor do they dispute that they are not Members of Deluge or signatories to the Operating Agreement or any other agreement with the Plaintiffs.

## ARGUMENT

"We start with bedrock: 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" McCarthy v. Azure, 22 F.3d 351, 355 (1st Cir. 1994), quoting AT&T Technologies, Inc. v. Communications Workers, 475 U.S. 643, 648 (1986) and United Steelworkers v. Warrior & Gulf Navig. Co., 363 U.S. 574 (1960). "Thus, a party seeking to substitute an arbitral forum for a judicial forum must show, at a bare minimum, that the protagonists have agreed to arbitrate *some* claims." McCarthy v. Azure, 22 F.3d at 355. Moreover, the burden is upon the party seeking to compel arbitration to make such a showing. See Miletic v. Holm & Wonsild, 294 F. Supp. 772, 775 (S.D.N.Y. 1968) ("The burden is upon the party seeking a stay to satisfy the court that a matter is referable to arbitration.") Here, it is undisputed that there is no written agreement between Kanter and Werner under which they agreed to arbitrate disputes arising between them. It is also undisputed that Werner is not, and has never been, a Member of Deluge. As recognized in McCarthy v. Azure, the federal policy in favor or arbitration "does not extend to situations in which the identity of the parties who have agreed to arbitrate is unclear."[3] 22 F.3d at 355. Consequently,

---

[3] Moreover, "when parties dispute the making of an agreement to arbitrate, a jury trial on the existence of the agreement is warranted unless there are no genuine issues of material fact regarding the parties' agreement." Avedon Eng'g, Inc. v. Seatex, 126 F.3d 1279, 1283 (10th Cir. 1997).

while a person may be deemed to have waived his right to adjudication, "there can be no waiver in the absence of an agreement signifying an assent."  Id.; see Arrants v. Buck, 130 F.3d 636, 640 (4th Cir. 1997) (courts may not compel arbitration in the absence of an agreement by the parties to do so).[4]

Here, the Defendants argue that Kanter has waived his right to adjudicate his claims against Werner and his companies because of the arbitration clause contained in the Operating Agreement, which he admittedly did not sign and makes no reference to him in any way whatsoever.  They point to no other agreement that provides a basis to compel arbitration.  Thus, "[a]s under general principles of contract law, the final answer to such a question is ordinarily a function of the parties' intent as expressed in the language of the contract documents." McCarthy v. Azure, 22 F.3d at 355; see NRM Corp. v. Hercules, Inc., 758 F.2d 676, 681 (D.C. Cir. 1985) ("the judicial task in construing a contract is to give effect to the mutual intentions of the parties").  In this case, the language of the Operating Agreement itself, which speaks only in terms of disputes between "Members" and is procedurally unworkable in connection with disputes not involving "Members," requires that the Defendants' motion be denied.

The district court's opinion in Local 205 v. Day Care Council of New York, Inc., 992 F. Supp. 388 (S.D.N.Y. 1998) is squarely on point.  Denying arbitration, the court held that "[a] contract should be read to give effect to all of its provisions and to render the provisions

---

[4] While the Plaintiffs are aware of the supplemental affidavit submitted by Portogon expressing a desire that this matter be resolved through mediation or arbitration, this expressed desire to have disputes resolved through arbitration "is not sufficient.  The parties must be mutually bound to the same arbitration agreement and their mutuality of obligation must be objectively manifested in writing.  Otherwise, there is no consideration and any statements regarding arbitration are mere illusory promises."  A.T. Cross Co. v. Royal Selangor(s) PTE, Ltd., 217 F. Supp. 2d 229, 237 (D.R.I. 2002).  Moreover, "[a]s a general rule, a court should not consider extrinsic evidence to give meaning to a contract unless the contract's terms are vague or ambiguous."  Smart v. Gillette Co. Long Term Disability Plan, 70 F.3d 173, 179 (1st Cir. 1995).  Thus, although the Plaintiffs appreciate Portogon's desire to resolve this dispute, that desire has absolutely no bearing on the proper interpretation of the plain language of the Operating Agreement.

consistent with each other." Id. at 392, citing Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 63 (1995). Specifically, the court looked not only at the substantive terms of the arbitration clause, but also the language of the arbitration procedures to give effect to the entire agreement. Noting that these procedures spoke only in terms of two identified entities and did not contemplate third parties, the court rejected the plaintiff union's efforts to expand the scope of the clause. Id. ("The language and structure of the grievance procedure set out in the CBA, however, are inconsistent with an intention to bind DCC to arbitration of disputes with the Union"). See McPheeters v. McGinn, Smith & Co., Inc., 953 F.2d 771, 774 (2nd Cir. 1992) (fact that arbitration provision referred to disputes between two parties indicated that the provision did not cover disputes involving a third party); Housh v. Dinovo Investments, Inc., 2003 WL 1119526, at *5 (D. Kan. Mar. 7, 2003) (where arbitration clause specifies that "parties" may bring arbitration claim, clause suggests that non-parties cannot invoke arbitration).

Similarly, in Smart Judge Selya stated that "[a]ccepted canons of construction forbid the balkanization of contracts for interpretive purposes." 70 F.3d at 179; see Fashion House, Inc. v. K Mart Corp., 892 F.2d 1076, 1084 (1st Cir. 1989) (examining agreement as a whole to interpret one part). As in Smart, "when parties list specific items in a document, any item not so listed is typically thought to be excluded." 70 F.3d at 179. Here, where the entire agreement speaks only in terms of the "Members" of Deluge, no reasonable reading of the agreement as a whole can result in the inclusion of non-Members in the arbitration clause.[5] See Paul Revere Variable Annuity Ins. Co. v. Kirshhofer, 226 F.3d 15, 23 (1st Cir. 2000) (courts should not interpret

---

[5] As in Smart, the defendants' "mental gymnastics" and selective reading of the Operating Agreement "score low marks for substance." 70 F.3d at 179. A plain reading of the Operating Agreement's entire dispute resolution provisions, as opposed to selected snippets taken out of context, makes clear that it speaks only in terms of disputes between "Members" as defined under the agreement.

contracts in ways that make no sense and should be reluctant to "drum out" clear language of the agreement).

As stated by the First Circuit in McCarthy v. Azure, the language of the relevant agreement itself is the best indicator of the parties' intent.  Here, as in that case, the language of the Operating Agreement, which speaks only to disputes among the defined "Members" of the Deluge, as defined to include only Kanter and Portogon, "translates into a direction to read the arbitration clause set forth in the [Operating Agreement] straightforwardly rather than expansively." 22 F.3d at 359.  As in McCarthy v. Azure, the Defendants' "effort to compel plaintiff to arbitrate cannot succeed, for, 'as a matter of contract, no party can be forced to arbitrate unless that party has entered an agreement to do so.'"  Id., quoting PaineWebber, Inc. v. Hartmann, 921 F.2d 507, 511 (3d Cir. 1990); see Grundstad v. Ritt, 106 F.3d 201, 204-05 (7th Cir. 1997) (rejecting arbitration where agreement did not specifically state that disputes with plaintiff would be arbitrable); Crellin Technologies v. Equipmentlease Corp., 18 F.3d 1, 7 (1st Cir. 1994) (law requires mutuality of obligation as prerequisite to binding bilateral contract).

The First Circuit's decision in McCarthy v. Azure also recognized, as the Defendants argue here, that under certain limited circumstances the law may allow non-signatories such as defendants to invoke arbitration provisions.  The First Circuit rejected those cases, however, stating that "[c]lose textual analysis supports the conclusion that the [agreement's] arbitration clause should be read more narrowly than the clauses in the cases upon which [defendant] relies."  22 F.3d at 358.  That is certainly the case here, where the arbitration clause speaks only to disputes between "Members" and the mechanics of invoking and proceeding in arbitration may only be utilized by "Members."  Unlike the cases cited by the Defendants, which all involve broad arbitration clauses such as those distinguished by the First Circuit in McCarthy v. Azure,

12

the arbitration clause in the present case makes clear that only disputes between "Members" of the LLC shall be covered by the arbitration agreement and provides for procedural mechanisms that are specifically limited to the "Members." Any other interpretation of the arbitration clause to include non-Members would read these specific terms out of the clause, which is disfavored.[6] See EEOC v. Waffle House, Inc., 534 U.S. 279, 289 (2002) ("[a]bsent some ambiguity in the agreement, however, it is the language of the contract that defines the scope of disputes subject to arbitration.…For nothing in the [Federal Arbitration Act] authorizes a court to compel arbitration of any issues, or by any parties, that are not already covered in the agreement").

In addition, the Defendants' argument that the relief sought by the Plaintiffs somehow arises under the Operating Agreement is simply wrong. To the contrary, the Amended Complaint makes clear that the references to the Operating Agreement are solely made to demonstrate that none of the Defendants are Members of Deluge and that their activities are entirely unauthorized and illegal and fall outside the Operating Agreement. In addition, to the extent that the Defendants might argue that they are somehow Members of the LLC, the Operating Agreement's provisions for adding new Members are cited to belie that contention. However, in no way are the Plaintiffs seeking any affirmative relief against the Defendants through the provisions of the Operating Agreement. Nor could they, because none of the Defendants are signatories of the Operating Agreement or Members of the LLC. Consequently,

---

[6] Also instructive regarding the applicability of the defendants' equitable estoppel argument is the recent Illinois appellate decision in Ervin v. Nokia, Inc., 2004 WL 1433319, at *6-*7 (Ill. App. June 22, 2004). Rejecting the decisions in Grigson and Hughes Masonry relied upon by the defendants here, the court held that its refusal to expand the concept of equitable estoppel to "allow a nonsignatory to force a signatory to arbitrate" was consistent with the Supreme Court's decisions in First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938 (1995) and EEOC v. Waffle House, Inc., 534 U.S. 279 (2002). The Court noted that the Supreme Court has made clear in these decisions that contracts should be enforced according to their terms, and absent an express consent to arbitrate disputes with a specific party, courts should not compel arbitration. The Supreme Court's Waffle House decision post-dates all of the authority cited by defendants.

there is no claim for breach of fiduciary duty or breach of contract against the Defendants arising from the terms of the Operating Agreement, nor is there any attempt to enforce any provision of the Operating Agreement against the Defendants.[7] Rather, all of the claims are brought against the Defendants under statutory and common law, entirely independent of the Operating Agreement, distinguishing each of the cases cited by Defendants from the situation here. See McCarthy v. Azure, 22 F.3d at 357 (distinguishing each of the defendant's cases due to the specific language of the arbitration clause at issue); DSMC, Inc. v. Convera Corp., 273 F. Supp. 2d 14 (D.D.C. 2002) (rejecting equitable estoppel argument where complaint referenced agreement, but claims against nonsignatory defendant did "not arise out of that contract, but rather from state and federal statutes and common law"), appeal dismissed, 349 F.3d 679 (D.C. Cir. 2003).

In sum, Defendants admit that they are not, nor have they ever been, Members of Deluge. They also admit that they have never signed any agreement of any kind requiring arbitration of disputes between themselves and the Plaintiffs. Based on these undisputed facts, and a plain reading of the Operating Agreement, the Defendants' motion to dismiss or stay this litigation must be denied.

---

[7] The Defendants argue that the Plaintiffs' request for an "accounting" of the amounts unlawfully taken by Defendants from Deluge LLC somehow triggers the terms and conditions of the Operating Agreement. That is simply not true. Rather, as in any case where a defendant is claimed to owe money from ongoing unlawful conduct, akin to embezzlement, one of the equitable remedies available to the plaintiff is to seek an accounting of those amounts. This request for an accounting, however, does not somehow render the defendants Members under the Operating Agreement.

14

## **CONCLUSION**

For all the foregoing reasons, the Plaintiffs Scott A. Kanter and Deluge, LLC respectfully request that the Court deny the Defendants' motion to dismiss or in the alternative to stay these proceedings pending mediation or arbitration.

                Respectfully submitted,

                SCOTT A. KANTER and DELUGE,
                By their attorneys,

                /s/ Christopher F. Robertson
                Christopher F. Robertson (BBO No. 642094)
                SEYFARTH SHAW LLP
                World Trade Center East
                Two Seaport Lane, Suite 300
                Boston, MA 02210-2028
                Telephone:    (617) 946-4800
                Telecopier:    (617) 946-4801

Date: July 28, 2004

## CERTIFICATE OF SERVICE

    On July 28, 2004, I caused to be served a copy of the foregoing document by first class mail, postage prepaid, upon all counsel of record.

                                       /s/ Christopher F. Robertson
                                       Christopher F. Robertson

BO1 15657410.1