# OPERATING AGREEMENT
## DELUGE, LLC

This Operating Agreement, dated as of the 15th day of April, 1997, is by and between Scott A. Kanter and Portogon Investments, S.A., (individually referred to as a "Member" and collectively as the "Members").

Whereas, Deluge, LLC (the "Company") has been formed pursuant to the Massachusetts Limited Liability Company Act (the "Act") by the filing on April 15, 1997, of a Certificate of Organization in the office of the Secretary of State of the Commonwealth of Massachusetts.

NOW, THEREFORE, in consideration of the mutual covenants herein expressed, the parties hereto hereby agree as follows:

### ARTICLE I - DEFINITIONS

1.1  **Definitions.** As used in this Operating Agreement, the following terms shall have the respective meanings set forth below:

(a)  "Accounting" shall have the meaning given to it in Section 7.5 of this Operating Agreement.

(b)  "Capital Account" as of any given date shall mean the Capital Contribution to the Company by a Member as adjusted up to the date in question pursuant to Article IX of this Operating Agreement.

(c)  "Capital Contribution" shall mean any contribution to the capital of the Company in cash or property by a Member whenever made. "Initial Capital Contribution" shall mean the initial contribution to the capital of the Company pursuant to this Operating Agreement.

(d)  "Cash Flow" shall mean the net earnings of the Company for a given fiscal year less all interest charges (exclusive of any interest charges with respect to the Loan), taxes and depreciation.

(e)  "Certificate of Organization" shall mean the Certificate of Organization of Deluge, LLC filed with the Secretary of the State of the State of Massachusetts as the same may be amended from time to time.

(f)  "Code" shall mean the Internal Revenue Code of 1986, as amended, and any successor statute of similar import, and the rules and regulations promulgated thereunder, in each case as in effect from time to time.

(g)  "Company" shall mean Deluge, LLC.

(h)  "Economic Interest" shall mean a Member's or Economic Interest Owner's share of one or more of the Company's Net Profits, Net Losses and distributions of the Company's assets pursuant to this Operating Agreement and the Massachusetts Act, but shall not include any right to

BOST1-607297-1

participate in the management or affairs of the Company, including, the right to vote on, consent to or otherwise participate in any decision of the Members.

    (i)    "Economic Interest Owner" shall mean the owner of an Economic Interest who is not a Member.

    (j)    "Involuntary Withdrawal" shall mean, with respect to any Member, the occurrence of any of the following events:

    (i)    the Member makes an assignment for the benefit of creditors;

    (ii)    the Member files a voluntary petition of bankruptcy;

    (iii)    the Member is adjudged bankrupt or insolvent or there is entered against the Member an order for relief in any bankruptcy or insolvency proceeding;

    (iv)    the Member files a petition or answer seeking for the Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation;

    (v)    the Member seeks, consents to, or acquiesces in the appointment of a trustee for, receiver for, or liquidation of the Member or of all or any substantial part of the Member's properties;

    (vi)    the Member files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in any proceeding described in subsections (i) through (v);

    (vii)    any proceeding against the Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation, continues for one hundred twenty (120) days after the commencement thereof, or the appointment of a trustee, receiver, or liquidator for the Member or all or any substantial part of the Member's properties without the Member's agreement or acquiescence, which appointment is not vacated or stayed for one hundred twenty (120) days or, if the appointment is stayed, for one hundred twenty (120) days after the expiration of the stay during which period the appointment is not vacated;

    (viii)    if the Member is an individual, the Member's death or adjudication by a court of competent jurisdiction as insane or incompetent to manage the Member's person or property;

    (ix)    if the Member is acting as a Member by virtue of being a trustee of a trust, the termination of the trust;

    (x)    if the Member is a partnership or another limited liability company, the dissolution and commencement of winding up of the partnership or limited liability company;

    (xi)    if the Member is a corporation, the dissolution of the corporation or the revocation of its charter; or

(xii) if the Member is an estate, the distribution by the fiduciary of the estate's entire interest in the limited liability company.

(k) "Massachusetts Act" shall mean the Massachusetts Limited Liability Company Act, Chapter 156C of the Massachusetts General Laws, as amended

(l) "Member" shall mean each of the parties who executes a counterpart of this Operating Agreement as a Member and each of the other parties who may hereafter become a Member in accordance with the terms of this Operating Agreement

(m) "Membership Interest" shall mean a Member's entire interest in the Company including such Member's Economic Interest and the right to participate in the management of the business and affairs of the Company, including the right to vote on, consent to, or otherwise participate in any decision or action of or by the Members granted pursuant to this Operating Agreement and the Massachusetts Act.

(n) "Net Profits" and "Net Losses" shall mean the income, gain, loss, deductions (including provisions for reasonable reserves) and credits of the Company in the aggregate or separately stated, as appropriate, determined by the Company's accountants at the close of each fiscal year on the Company's information tax return filed for federal income tax purposes.

(o) "Operating Agreement" shall mean this Operating Agreement as originally executed and as amended from time to time..

(p) "Permitted Transfer" shall have the meaning given to it in Section 12.2 of this Operating Agreement

(q) "Person" shall mean any individual, general partnership, limited partnership, limited liability company, trust, estate, association, corporation or any other legal or commercial entity and the heirs, executors, administrators, legal representatives, successors, and assigns of such "Person" where the context so permits.

(r) "Person" shall mean any individual, general partnership, limited partnership, limited liability company, trust, estate, association, corporation or any other legal or commercial entity and the heirs, executors, administrators, legal representatives, successors, and assigns of such "Person" where the context so permits.

(s) "Profit Interest" shall mean a Member's right to Net Profits and Net Losses as set forth in Article X of this Operating Agreement.

(t) "Qualifying Transfer" shall have the meaning given to it in Section 12.3 of this Operating Agreement.

(u) "Significant Event" shall have the meaning given to it in Section 12.7 of this Operating Agreement

(v) "Regulatory Allocations" shall have the meaning given to it in Section 10.3 of this

Operating Agreement.

    (w) "Request" shall have the meaning given to it in Section 12.3 of this Operating Agreement..

    (x) "Transfer" shall have the meaning given to it in Section 12.1 of this Operating Agreement.

    (y) "Transferee" shall have the meaning given to it in Section 12.3 of this Operating Agreement.

    (z) "Transferor" shall have the meaning given to it in Section 12.3 of this Operating Agreement.

    (aa) "Treasury Regulations" shall include temporary and final regulations promulgated under the Code in effect as of the date of filing the Certificate of Organization and the corresponding sections of any regulations subsequently issued that amend or supersede such regulations.

## ARTICLE II - FORMATION OF THE COMPANY

  2.1  _Formation_. The Company was organized on April __, 1997, as a Massachusetts limited liability company upon the filing of its Certificate of Organization with the Secretary of the State of the Commonwealth Massachusetts in accordance with and pursuant to the Massachusetts Act.

  2.2  _Principal Place of Business_. the Company's principal place of business shall be at c/o Kanter, Feingold, Orleans & Troy, 109 State Street, Boston, MA 02109, or at such other place as the Members may from time to time deem advisable.

  2.3  _Registered Agent and Registered Office_. the Company's initial registered agent and registered office shall be Scott A. Kanter, c/o Kanter, Feingold, Orleans & Troy, 109 State Street, Boston, MA 02109. The Company may change its registered agent and registered office by filing the name and/or address of the new agent and/or office with the Secretary of the State of the Commonwealth Massachusetts pursuant to the Massachusetts Act.

  2.4  _Term_. The term of existence of the Company shall commence on the date of filing of the Certificate of Organization with the Secretary of the State of the Commonwealth Massachusetts and shall end on April ___, 2047, unless the Company is earlier dissolved in accordance with either the provisions of this Operating Agreement or the Massachusetts Act.

  2.5.  _Managers_. At the time of formation of the Company, Scott A. Kanter is the sole manager.

  2.6  _Execution of Documents_. Scott A. Kanter is authorized to execute any documents to be filed with the Secretary of State of the Commonwealth of Massachusetts and authorized to execute, acknowledge, deliver and record any recordable instrument purporting to affect an interest in real property.

  2.7  _Business of the Company_. The general character of the business of the Company is to operate a commercial spring water source.

2.8. <u>Company's EIN Number</u>. the Company does not yet have an EIN Number, but has made application therefor.

### ARTICLE III - BUSINESS OF THE COMPANY

3.1 <u>Permitted Business</u>. The business of the Company shall be:

(a) To accomplish any lawful business whatsoever or which shall at any time appear conducive to or expedient for the protection or benefit of the Company and its assets;

(b) To engage in any lawful act or activity for which limited liability companies may be formed under the Massachusetts Act; and

(c) To engage in all activities necessary, customary, convenient, or incident to any of the foregoing.

### ARTICLE IV - NAMES AND ADDRESSES OF MEMBERS

4.1 <u>Names and Addresses</u>. The names and addresses of the initial Members are as follows:

| NAME | ADDRESS |
|---|---|
| Scott A. Kanter | c/o Kanter, Feingold, Orleans & Troy<br>109 State Street<br>Boston, MA 02109 |
| Portogon Investments, S.A. | Mr. Martin Richardson<br>Portogon Investments, S.A.<br>P.O. Box 83<br>Ordinance House<br>31 Pier Road<br>St. Helier, Jersey JE 48 PW<br>Channel Island<br>United Kingdom |

4.2     Membership Interests. Each Member's Membership Interest is as follows:

| MEMBER | MEMBERSHIP INTEREST |
|---|---|
| Scott A. Kanter | 33.333% |
| Portogon Investments, S.A. | 66.666% |

The Membership Interests set forth above may be adjusted on the basis of additional Capital Contributions that may be made, from time to time, by one or more Members. Each adjustment to the Membership Interests shall be determined by written determination of the Managers.

### ARTICLE V- MANAGEMENT BY MEMBERS

5.1     Management. the Company shall be member-managed. The Members shall have the authority to (i) exercise all the powers and privileges granted by the Massachusetts Act or any other law or this operating agreement, together with any powers incidental thereto, so far as such powers are necessary or convenient to the conduct, promotion or attainment of the business, trade, purposes or activities of the Company and (ii) to take any other action not prohibited under the Massachusetts Act or other applicable law.

5.2     Certain Powers of Members. Without limiting the generality of Section 5.1 of this Operating Agreement, the Members shall have the power and authority on behalf of the Company:

(a)     To purchase liability and other insurance to protect the Company's property and business;

(b)     To open bank accounts in the name of the Company;

(c)     To employ accountants, legal counsel, managing agents or other experts to perform services for the Company and to compensate them from Company funds; and

(d)     To do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

Unless authorized to so do by this Operating Agreement or by written authorization of the Members of the Company, no attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose. No Member shall have any power of authority to bind the Company unless the Member has been authorized by the Members to act as an agent of the Company in accordance with the previous sentence.

5.3     Unanimous Vote. Notwithstanding the provisions of Section 5.2 of this Operating Agreement, the taking of any actions by or on behalf of the Company shall require the unanimous vote of all of the Members, including, without limitation, the following:

(a)     To invest any Company funds temporarily (by way of example but not limitation)

in time deposits, short-term governmental obligations, commercial paper or other investments;

    (b)  To acquire assets or property from any Person (the fact that a Member is directly or indirectly affiliated or connected with any such Person shall not prohibit the Members from dealing with the Person);

    (c)  To borrow money on behalf of the Company from banks, other lending institutions, the Members, or affiliates of the Members on such terms as the Members deem appropriate, and in connection therewith, mortgaging, hypothecating, encumbering or otherwise granting security interests in the assets of the Company to secure repayment of the borrowed sums;

    (d)  To sell, exchange or otherwise dispose of all, or substantially all, of the Company's assets as part of a single transaction or plan;

    (e)  To execute on behalf of the Company all instruments and documents, including, without limitation, checks, drafts, notes and other negotiable instruments, mortgages or deeds of trust, security agreements, financing statements, documents providing for the acquisition, mortgage or disposition of the Company's property, assignments, bills of sale, operating or capital leases, partnership agreements and operating agreements of other limited liability companies;

    (f)  To enter into contracts and agreements obligating the Company to lease its assets or properties or otherwise perform services; and

    (g)  To dissolve the Company.

### ARTICLE VI - BUSINESS OF THE COMPANY

6.1    *Company's Business*. The general character of the business of the Company is to operate a commercial spring water source, own real estate and engage in any and all activities which are lawful for Limited Liability Companies to undertake under the Act.

### ARTICLE VII - EXPENSES

7.1    *Payment of Professional and Other Fees, Costs and Expenses*. the Company shall pay all fees, costs and expenses of attorneys, accountants, managing agents and other experts and professionals, as well as the fees, costs and expenses in connection with other services rendered to the Company and which are reasonably incurred by the Company in the performance of its business.

7.2    *Reimbursement of Expenses*. Any Member shall be reimbursed by the Company for all out-of-pocket expenses reasonably incurred by such Member on behalf of the Company in the performance of any of the duties and responsibilities authorized hereby. The reimbursement of such business expenses shall be subject to biweekly presentation to and approval of the [Company/Members] of a complete expense report together with appropriate supporting documentation for such expenses.

### ARTICLE VIII - RIGHTS AND OBLIGATIONS OF MEMBERS

8.1    *Limitation of Liability*. To the maximum extent permitted under the Massachusetts Act, the Company:

    (a)  hereby eliminates the personal liability of a Member for monetary damages for

breach of any duty set forth in the Massachusetts Act; and

(b) shall indemnify the Members and make advances for expenses to the maximum extent permitted under the Massachusetts Act.

8.2  List of Members.  Upon written request of any Member, the Company shall provide such Member with a list showing the names, addresses and Profit Interests of all Members.

8.3  Priority.  No Member shall have priority over any other Member as to Net Profits, Net Losses or distributions; provided that this Section 8.3 shall not apply to repayments of loans (as distinguished from Capital Contributions) which a Member has made to the Company.

8.4  Loans to Company.  A Member, with the consent of all other Members, may loan the Company cash or other property, with or without security.

8.5  Loss of Member's Voting Rights.  Upon the death of Leonard Kozlowski or R. Michael Hans, all voting rights represented by the Membership Interest held by the deceased (and that of his successors and assigns) shall terminate.  Upon the death of the second to die of Leonard Kozlowski and R. Michael Hans, all voting rights represented by all Membership Interests shall be restored in full.

## ARTICLE IX - CONTRIBUTIONS AND CAPITAL ACCOUNTS

9.1  Member's Capital Contributions.  On or prior to date hereof, the Members have made an Initial Capital Contribution to the Company in cash in the amounts set forth below. In consideration of their respective Initial Capital Contributions to the Company, there are hereby created the following Capital Accounts in the following amounts:

| | |
|---|---|
| Scott A. Kanter | -$33.333- |
| Portogon Investments, S.A. | -$66.666- |

9.2  Capital Accounts.

(a)  A separate Capital Account will be maintained for each Member in accordance with Treasury Regulation 1.704-1(b).  Each Member's Capital Account will be increased by (1) the amount of money contributed by such Member to the Company; (2) the fair market value of property contributed by such Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code); (3) allocations to such Member of Net Profits; and (4) allocations to such Member of income described in Section 705(a)(1)(B) of the Code.  Each Member's Capital Account will be decreased by (1) the amount of money distributed to such Member by the Company; (2) the fair market value of property distributed to such Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Section 752 of the Code); (3) allocations to such Member of expenditures described in Section 705(a)(2)(B) of the Code; (4) allocations to such Member of Net Losses; and (5) allocations to the account of such Member of Company loss and deduction as set forth in such section of the Code, taking into account adjustments to reflect book value.

(b)  In the event of a permitted sale, exchange or other disposition of a Membership Interest or Economic Interest in the Company, the Capital Account of the Transferor shall become the Capital Account of the Transferee to the extent it relates to the Membership Interest or Economic

- 8 -

Interest transferred to the Transferee in accordance with Section 1.704-1(b)(2)(iv) of the Treasury Regulations.

(c) Except as otherwise required by the Massachusetts Act, no Member shall have any liability to restore all or any portion of a deficit balance in such Member's Capital Account.

9.3 <u>Withdrawal or Reduction of Members' Contributions to Capital</u>.

(a) A Member shall not receive out of the Company's property any part of its Capital Contribution until all liabilities of the Company, except liabilities to Members on account of their Capital Contributions, have been paid or there remains property of the Company sufficient to pay them.

(b) A Member, irrespective of the nature of his Capital Contribution, has the right to demand and receive only cash in return for its Capital Contribution.

9.4 <u>Interest On and Return of Capital Contributions</u>. No Member shall be entitled to interest on its Capital Account or return of its Capital Contribution, except as otherwise specifically provided for in this Operating Agreement.

## ARTICLE X - ALLOCATIONS AND DISTRIBUTIONS

10.1 <u>Allocations of Profits and Losses from Operations</u>. The Net Profits and Net Losses for each fiscal year shall be allocated to the Members in accordance with their respective Membership Interests at the end of the fiscal year.

10.2 <u>Distributions</u>. Except as provided for in Article XVI of this Operating Agreement, all distributions of cash or other property shall be made to the Members <u>pro rata</u> in proportion to their respective Profit Interests on the date of the distribution.

10.3 <u>Regulatory Allocations</u>. Notwithstanding the allocations in Section 10.1 of this Operating Agreement, and to the extent the Members deem it necessary to ensure that the Operating Agreement and the allocations thereunder meet the requirements of Code Section 704 and the allocations in this Section 10.3 (the "Regulatory Allocations"), allocations of the following type and in the following priority will be made to the appropriate Members in the necessary and required amounts as set forth in the Regulations under Code Section 704(b) before any other allocation under this Article X:

(a) Member nonrecourse debt minimum gain chargeback under Treasury Regulations Section 1.704-2(i) (which is referred to as partner nonrecourse debt minimum gain chargeback thereunder);

(b) Company minimum gain chargeback under Treasury Regulations Section 1.704-2(f) (which is referred to as partnership minimum gain chargeback thereunder), provided that the Company may seek a waiver of such chargeback in appropriate circumstances under Treasury Regulations Section 1.704-2(f)(4);

(c) In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of Company income and gain shall be allocated to such Member in an amount and manner sufficient to eliminate the deficit balance in its Capital Account (excluding from such deficit balance amounts, if any,

such Member is obligated to restore under this Operating Agreement or is treated as obligated to restore pursuant to Treasury Regulations Sections 1.704-1(b)(2)(ii)(c), 1.704-1(b)(2)(ii)(h), 1.704-2(g) or 1.704-2(i)(5)) created by such adjustments, allocations or distributions as quickly as possible and in a manner which complies with Treasury Regulations Section 1.704-1(b)(2)(ii)(d); this provision is intended to comply with the qualified income offset requirement contained in Treasury Regulations Section 1.704-2(b)(ii)(d)(3) and shall be construed in accordance with the provisions thereof;

(d)  Member nonrecourse deductions under Treasury Regulations Section 1.704-2(i), which will in all cases be allocated to the Member who bears the economic risk of loss for the indebtedness to which such deductions are attributable; and

(e)  To the extent an adjustment to the adjusted tax basis of any property under Code Sections 734(b) or 743(b) is required to be taken into account in determining Capital Accounts under Treasury Regulations Section 1.704-1(b)(2)(v)(m), the amount of the adjustment to the Capital Accounts will be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis), and the gain or loss will be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted under Treasury Regulations Section 1.704-1(b)(2)(iv)(m).

These Regulatory Allocations are intended to comply with certain requirements of Treasury Regulations Sections 1.704-1(b) and 1.704-2. The Regulatory Allocations may affect results which would not be consistent with the manner in which the Members intend to divide Company distributions. Accordingly, the Members agree to divide other allocations of profits, losses and other items among themselves so as to prevent the Regulatory Allocations from distorting the manner in which distributions would be divided among the Members under Section 10.1 of this Operating Agreement if such distributions were made in accordance with the Membership Interests of the Members but for the application of the Regulatory Allocations. In general, the reallocation will be accomplished by specially allocating other profits, losses and items of income, gain, loss and deductions, to the extent they exist, among the Members so that the net amount of the Regulatory Allocations and the special allocations to each Member is zero. Pursuant to Treasury Regulations Section 1.752-3(a)(3), solely for purposes of determining each Member's proportionate share of the "excess nonrecourse liabilities" (as defined in Treasury Regulations Section 1.752-3(a)(3)) of the Company, the Members' respective interests in profits will be equal to their Membership Interest.

10.4  **Transferor - Transferee Allocations: Code Section 754 Election.** Income, gain, loss, deduction or credit attributable to any Membership Interest in the Company which has been transferred shall be allocated between the transferor and the transferee under any method allowed under Section 705 of the Code as agreed by the transferor and the transferee. The Members, upon the written consent of all Members, may determine to make the election provided under Section 754 of the Code and any corresponding provision of applicable state law.

10.5  **Tax Allocations: Code Section 704(c).** With regard to income, gain, loss, depreciation, depletion and cost recovery deductions for federal income tax purposes: In the case of contributed property, such items will be allocated among the Members in the manner provided in Section 704(c) of the Code and its Treasury Regulations to take account of the built-in gain and built-in loss at the time of contribution and, in the case of any property the carrying value of which has been adjusted pursuant to this Article X, such items will be allocated among the Members in a manner consistent with the principles of Section 704(c) of the Code and its Treasury Regulations to take into account differences between the gross asset value and the adjusted tax basis of such property at the time of such adjustment. Allocations under this Section 10.5 are solely for purposes of federal, state and local taxes and will not

- 10 -

affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Profits and Net Losses, other items or distributions under any provision of this Operating Agreement.

   10.6   Member Acknowledgment. The Members agree to be bound by the provisions of this Article X in reporting their share of the Company's income and loss for federal, state and local income tax purposes.

### ARTICLE XI - ACCOUNTING, RECORDS AND REPORTS

   11.1   Accounting Period. the Company's fiscal year shall be the calendar year.

   11.2   Records and Reports. the Company shall keep at its principal place of business the following records:

   (a)   A current list of the full name and last known business, residence, or mailing address of each past and present Member;

   (b)   A copy of the Certificate of Organization of the Company and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any certificates of amendment have been executed;

   (c)   Copies of the Company's federal, state and local income tax returns and financial statements for the six (6) most recent fiscal years or, if such returns and statements were not prepared for any reason, copies of the information and statements provided to, or which should have been provided to, the Members to enable them to prepare their federal, state and local income tax returns for such period;

   (d)   Copies of any of the Company's past and present written operating agreements and all amendments thereto; and

   (e)   Copies of the Company's annual reports filed with the Secretary of the State the Commonwealth Massachusetts.

### ARTICLE XII
### RESTRICTIONS ON TRANSFERABILITY OF A MEMBER'S INTEREST

   12.1   General. No Member or Economic Interest Owner shall have the right to sell, transfer, assign, pledge, hypothecate, grant a security interest in or otherwise encumber all or any part of its Membership Interest or Economic Interest (collectively, a "Transfer") prior to January 1, 1999. On and after January 1, 1999, a Transfer may be effected only pursuant to the express provisions of this Article XII.

   12.2   Certain Permitted Transfers. Notwithstanding the provisions of Section 12.1 of this Operating Agreement, any Member or Economic Interest Owner may at any time (i) Transfer all or any part of its Membership Interest or Economic Interest upon the occurrence of an Involuntary Withdrawal or (ii) make a gift of all or any part of its Membership Interest or Economic Interest to its spouse and/or any of its lineal descendants and their spouses (or to a trust for any of their benefit), or to any entity which is an affiliate of any of the foregoing, during its lifetime or by bequest upon its death, subject to

compliance with the provisions of Section 12.4 of this Operating Agreement (a "Permitted Transfer"). Such Member or Economic Interest Owner shall establish one or more trusts to hold such Membership Interest or Economic Interest, as the case may be, for the benefit of any donee who is under twenty-five (25) years of age until such donee shall reach the age of at least twenty-five (25) years.

12.3 <u>Right of First Refusal</u>.

(a) Any Member or Economic Interest Owner who desires to make a Transfer (a "Transferor"), other than a Permitted Transfer, shall obtain from the proposed transferee (the "Transferee") a bona fide written request or offer (the "Request") stating in reasonable detail the terms and conditions upon which the Transfer is to be made, including, without limitation, the amount and nature of any consideration to be paid for the Transfer. The Transferor shall furnish a copy of the Request to all of the other Members or their transferees, as the case may be, by certified mail or personal delivery, within three (3) days after receiving the Request. Upon the request of any Member or transferee, the Transferor shall furnish to all of the Members such information regarding the Request and the identity of the Transferee as such Member reasonably shall request.

(b) All of the Members, or their transferees, as the case may be, other than the Transferor shall thereupon have the right to purchase or otherwise acquire from the Transferor, and the Transferor shall have the obligation to transfer and sell to them, all (but not less than all) of the Membership Interest or Economic Interest which is the subject of the proposed Transfer, upon the same terms and conditions stated in the Request. If more than one Member or transferee elects to participate in such purchase, then all participating Members or transferees shall make the purchase on a pro rata basis in proportion to their respective Profit Interests.

(c) Any Member or transferee, as the case may be, who desires to participate in such purchase shall give written notice thereof to the Transferor and the other Members or transferees by certified mail or personal delivery, within thirty (30) days after receiving a copy of the Request. No Member or transferee shall be entitled to participate in such purchase if it fails to give such notice to the Transferor and the other Members or transferees within such thirty (30) day period.

(d) The Members or transferees, as the case may be, participating in such purchase shall have the right to designate the time, date and place of closing, provided that such closing shall occur within forty-five (45) days after their receipt of the Request and the date of closing shall be a day on which banks are open for business in the Commonwealth Massachusetts.

(e) If no Member or transferee exercises its right of purchase, the Transferor may make the proposed Transfer (a "Qualifying Transfer") to the Transferee upon the terms and conditions specified in the Request if such Transfer is made within forty-five (45) days after the lapse of the rights of the Members with respect to such Transfer. No such Transferee may become a Member except in accordance with the provisions of Section 12.6 of this Operating Agreement.

12.4 <u>Obligations of Transferee and Transferor</u>. No Permitted Transfer or Qualifying Transfer shall be legally effective or binding upon the Company or the Members unless the Transferor and the Transferee execute, acknowledge and deliver to the Company such instruments of transfer, assignment and assumption and such other certificates, representations and documents, and perform all such other acts which the remaining Members deem necessary or desirable to:

(a) constitute the Transferee as a successor-in-interest to the Transferor;

(b) confirm that the Transferee has accepted, assumed and agreed to be subject to and bound by all of the terms, obligations and conditions of this Operating Agreement, as amended (whether such person is to be admitted as a Member or will merely be an Economic Interest Owner);

(c) preserve the Company after the completion of such Transfer under the laws of each jurisdiction in which the Company is qualified, organized or does business;

(d) maintain the status of the Company as a partnership for federal tax purposes; and

(e) assure compliance with any applicable state and federal laws including securities laws and regulations.

12.5    Indemnification by Transferor. Each Transferor hereby indemnifies the Company and the Members against any and all losses, damages, and expenses (including, without limitation, tax liabilities or loss of tax benefits) arising directly or indirectly out of any Transfer or purported Transfer in violation of this Article XII.

12.6    Transferee Not a Member in Absence of Member Consent.

(a) With the written consent of all of the remaining Members, any Transferee of a Membership Interest who is not already a Member immediately prior to a Transfer shall become a Member. Any Transferee who does not receive the written consent of all of the remaining Members shall not become a Member and shall have no right to participate in the management of the business or affairs of the Company or to vote on or consent to any matter requiring a vote or the consent of the Members and shall merely be an Economic Interest Owner.

(b) If any Transferor who is also a Member shall make a Transfer of his or her Economic Interest (or a portion thereof), other than a Transfer by way of pledge, hypothecation, grant of a security interest or other encumbrance, which does not at the same time transfer the balance of rights associated with the Economic Interest transferred by the Member (including, without limitation, the rights of the Transferor to participate in the management of the business and affairs of the Company), upon and contemporaneously with such Transfer, the Company shall purchase from the Transferor, and the Transferor shall sell to the Company for a purchase price of one hundred dollars ($100.00), all remaining rights and interests retained by the Transferor which immediately prior to the Transfer were associated with the transferred Economic Interest. Such Transferor's Membership Interest shall be reduced in proportion to such Economic Interest transferred by the Transferor and the Transferor shall execute and deliver to the remaining Members such instruments and documents as the remaining Members shall reasonably request in order to confirm such change in status.

(c) The restrictions on transfer contained in this Section 12.6 are intended to comply (and shall be interpreted consistently) with any restrictions on transfer set forth in the Massachusetts Act.

## ARTICLE XIII - ADDITIONAL MEMBERS

13.1    New Members. From the date of the formation of the Company, a Person may become a Member in the Company only upon the unanimous written consent of all Members. In the case of a Transfer of a Membership Interest, such Transferee may become a Member only upon the unanimous written consent of the remaining Members. No new Members shall be entitled to any retroactive

allocation of losses, income or expense deductions incurred by the Company. The Members may, at their option, at the time a new Member is admitted, close the Company books (as though the Company's tax year had ended) or make pro rata allocations of loss, income and expense deductions to a new Member for that portion of the Company's tax year in which a Member was admitted in accordance with the provisions of Section 706(d) of the Code.

## ARTICLE XIV - EVENT OF DISSOCIATION OF A MEMBER

14.1 <u>Event of Dissociation</u>. A Member shall cease to be a Member of the Company only in accordance with the provisions of this Operating Agreement or as otherwise provided in the Massachusetts Act.

## ARTICLE XV - DISSOLUTION OF THE COMPANY

15.1 <u>Dissolution</u>. the Company shall be dissolved and its affairs shall be wound up upon the happening of the first to occur of the following:

(a) The sale or other disposition of all or substantially all of the assets of the Company, unless the disposition is a transfer of assets of the Company in return for consideration other than cash and, a determination is made by all the Members not to distribute any such non-cash items to the Members;

(b) A Transfer or Involuntary Withdrawal of a Member as to all of his interest as a Member, if there is no election, pursuant to Section 15.2, to continue the Company;

(c) The election to dissolve the Company made in writing by all the Members;

(d) Any consolidation or merger of the Company with or into any entity in which the Company is not the resulting or surviving entity;

(e) Upon the occurrence of an event specified under the laws of the Commonwealth of Massachusetts as one effecting dissolution, except that where, under the terms of this Agreement the Company is not to terminate, then the Company shall immediately be reconstituted and reformed on all the applicable terms, conditions, and provisions of this Operating Agreement; or

(f) Upon the death, insanity, retirement, resignation, expulsion, bankruptcy, dissolution or occurrence of any other event which terminates the membership of a Member, if there is no election, pursuant to Section 15.2, to continue the Company.

15.2 <u>Continuation of the Company</u>. Notwithstanding a Transfer or Involuntary Withdrawal from the Company of a Member as to all of his interest as a Member, or the occurrence of any other event which constitutes an event of dissolution of an Company under the Massachusetts Act or this Agreement including without limitation, the expulsion of a Member, the Company shall not be dissolved and its affairs shall not be wound up, and it shall remain in existence as a limited liability company under the laws of the Commonwealth of Massachusetts, if there are at least two (2) Members of the Company remaining after such event, Transfer or Involuntary Withdrawal, and such remaining Members continue the business of the Company by electing to do so within ninety (90) days after the occurrence of any of such event Transfer, or

Involuntary Withdrawal. Any such election shall be made by the Members by action of the holders of more than fifty percent (50%) in Membership Interests.

## ARTICLE XVI - LIQUIDATION OF THE COMPANY

16.1    Winding Up.  Upon dissolution of the Company, the business and affairs of the Company shall be wound up in accordance with the Massachusetts Act.

16.2    Liquidating Distributions.  Upon the winding up of the Company, the assets of the Company shall be distributed as follows:

(a) first, payment, or adequate provision for payment, shall be made to creditors of the Company, including to the extent permitted by law, Members who are creditors of the Company, in satisfaction of liabilities of the Company;

(b) second, to the Members in satisfaction of liabilities for distributions under Sections 31 and 32 of the Massachusetts Act; and

(c) third, to the Members, first, for the return of their Capital Accounts and second, in proportion to which the Members share in distributions.

## ARTICLE XVII - ALTERNATIVE DISPUTE RESOLUTION

17.1    Mediation.  In the event that any dispute shall arise between the Members as to the interpretation of this Operating Agreement or any dispute that may arise between the Members under this Operating Agreement or any dispute in regard to the management or operation of the Company, such dispute shall first be attempted to be resolved by non-binding mediation conducted on terms and conditions acceptable to all parties to such dispute using the American Arbitration Association ("AAA"). No provision of, or the exercise of any rights under, this paragraph shall limit the right of any party to obtain provisional or ancillary remedies such as injunctive relief from a court having jurisdiction before, during or after the pendency of any mediation.

17.2    Arbitration.  In the event that such dispute is not resolved by mediation, such dispute shall be submitted to a board of arbitrators. The board of arbitrators shall consist of three (3) persons, one (1) selected by the aggrieved Member, one (1) selected by the unanimous consent of all of the remaining Members (or, if the dispute is between two Members, by such other Member), and the third to be selected by the two (2) arbitrators chosen by the Members. In the event that the three (3) arbitrators shall not be agreed upon within fifteen (15) days from the date that it is first indicated by a Member that the Member desires arbitration, the aggrieved Member may apply to the presiding Judge of the court of Norfolk County for the selection of a single arbitrator to hear and determine the dispute. The Judge of such Court shall select an arbitrator within thirty (30) days from the date of application and said arbitrator shall be authorized to hear and dispose of the dispute. The decision of the board of arbitrators or the arbitrator, as the case may be, shall be final and binding upon the Members. The costs of any mediation or arbitration, as the case may be, shall be borne equally by the parties thereto.

## ARTICLE XVIII - MISCELLANEOUS

18.1 <u>Notices</u>. Any notice, demand, or communication required or permitted to be given by any provision of this Operating Agreement shall be deemed to have been sufficiently given or served for all purposes if delivered personally to the party or to an executive officer of the party to whom the same is directed or, if sent by registered or certified mail, postage and charges prepaid, addressed to the Member's or Company's address, as appropriate, which is set forth in this Operating Agreement.

18.2 <u>Governing Law</u>. This Operating Agreement shall be governed exclusively by the laws of the Commonwealth of Massachusetts.

18.3 <u>Waiver of Action for Partition</u>. Each Member irrevocably waives during the term of existence of the Company any right that they may have to maintain any action for partition with respect to the property of the Company.

18.4 <u>Amendments</u>. This Operating Agreement may not be amended except by the written agreement of all of the Members.

18.5 <u>Indemnification for Breach</u>. Any Member who shall breach any of the covenants and agreements contained in this Operating Agreement shall indemnify the other Members against and hold harmless from, all losses and expenses suffered by such other Members on account of such breach.

18.6 <u>Severability</u>. If any provision of this Operating Agreement shall be invalid, illegal or unenforceable to any extent, the remainder of this Operating Agreement shall not be affected and shall be enforceable to the fullest extent permitted by law.

18.7 <u>Heirs, Successors and Assigns</u>. Each and all of the covenants, terms, provisions and agreements contained in this Operating Agreement shall be binding upon and inure to the benefit of the Members and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors and assigns.

18.8 <u>Creditors</u>. None of the provisions of this Operating Agreement shall be for the benefit of or enforceable by any creditors of the Company.

18.9 <u>Headings for Convenience Only</u>. The headings in this Operating Agreement are inserted for convenience of reference only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Operating Agreement.

18.10 <u>Counterparts</u>. This Operating Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

The undersigned hereby agree, acknowledge and certify that the foregoing Operating Agreement, constitutes the Operating Agreement of Deluge, LLC adopted by the Members of the Company as of April 15, 1997.

MEMBERS:

_____
Scott A. Kanter


PORTOGON INVESTMENTS, S.A.

By: _____
Name: MARTIN WILLIAM RICHARDSON
Its: Director